**Rebecca Puck RITTSCHER, Formerly Known as Rebecca Puck, Appellant,**

v.

**STATE of Iowa, Iowa Department of Social Services (Formerly Known as Iowa Department of Social Welfare), Ralph A. Bachman, and Various Other Unknown Employees of the State of Iowa, Appellees.**

No. 83–980.

Supreme Court of Iowa.

June 13, 1984.

Mark A. Humphrey of Humphrey & Haas, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Sp. Asst. Atty. Gen., and Mark Hunacek, Asst. Atty. Gen., for appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McGIVERIN, and CARTER, JJ.

UHLENHOPP, Justice.

This appeal of an action under the state tort claims act involves alleged negligence of public officers and employees with respect to the welfare of a minor. The minor is now an adult, the plaintiff Rebecca Puck Rittscher.

The case history, on file in a county social services department and incorporated into Rebecca's petition, reveals the long story of an inadequate family. We briefly sketch the background.

In 1947 Helen Patchin, later to be Rebecca's mother, sought foster care for her children. In 1948 psychological tests were made of Alvin and Helen Patchin and their children, revealing that the parents were immature and unstable and the children were below normal in response and achievement. In 1949 Helen divorced Alvin, and the same year Alvin was committed to the men's reformatory. Also that year Helen asked the welfare department to place the children, then four in number, for adoption; the children were placed with the Lutheran Welfare Society. The same year Helen was treated for syphilis at University of Iowa Hospitals and for mental problems; the mental diagnosis there was psychoneurosis with depression, anxiety, and psychopathic behavior. By year's end Helen was living with her mother but made trips to University Hospitals. In 1950 Helen seemed to respond to casework but at times neurotic traits were almost psychotic. She expressed concern for her children and would not consider adoption, and two of them were returned to her. In 1951, Helen left her children with her mother, took a housekeeping job, attempted suicide, voluntarily committed herself to a mental health institute, was released to relatives, and married Theodore Wold. The children were again placed with the Lutheran Welfare Society. In 1952 three of the children were returned to Helen. Discussions occurred as to the fate of the children, the uncooperativeness of Helen, her psychoneurosis and promiscuity, and the lack of a legal basis for a permanent plan for the children. By 1955 the Lutheran Welfare

Society had attempted unsuccessfully for several years to work out permanent living arrangements for the children. In 1956 Theodore Wold was killed in an accident. In 1958 two of the children were involved in theft and the family was brought into court proceedings. In 1960 one of the daughters was successively placed in a children's home, a foster home, a mental health institute, and the Mitchellville Training School. In addition, Helen had a child out of wedlock that year. In 1961 Helen married Lewis Puck. In 1962 two of the children desired to leave home, Helen again became pregnant, and Helen and Lewis Puck had violent disagreements. On September 8, 1962, Helen gave birth to Rebecca, her twelfth child. That year three of the younger children were placed in foster homes (and later taken back by Helen and Lewis), and two older children left home. In 1963 complaints were made that Helen was loud, abusive, and irrational; she was committed to a mental health institute; a juvenile court placed one child in Mitchellville and another in a foster home; and two children were voluntarily placed with a home finding society. In 1965, Helen wrote letters to welfare officers containing rambling denunciations of Lewis Puck; the Pucks were divorced; and Helen received aid to dependent children. In 1966 Helen abandoned Rebecca and another child at the YWCA in Des Moines with a note that she could not care for them. Subsequently Rebecca was returned to Helen's home. In 1967 Rebecca was found in a comatose condition at school, taken to University Hospitals, and diagnosed as having had an emotional disturbance due to inconsistency of discipline. Helen was committed to a mental health institute, and the three children then at home, including Rebecca, went to the home of Lewis Puck's parents. (Apparently Helen and Lewis remarried at some point.) Also that year, Rebecca's half-sister Anna Marie Rittscher and her husband Keith Rittscher learned of Rebecca's comatose condition at school and her admission to University Hospitals. In November the Rittschers removed Rebecca from the home of the elder Pucks and took

her into their own home. In May 1968, a hearing was held in juvenile court. The court found Rebecca to be neglected and dependent and placed her custody with a deputy juvenile probation officer, although she continued to reside with the Rittschers and did so until October 1979.

Rebecca commenced an action in federal court alleging that the State and its employees failed to intervene and remove her from an unstable home environment, whereby she sustained severe mental and emotional problems. The court dismissed the complaint on the grounds that the action was against the State and the court had no jurisdiction under the eleventh amendment to the United States Constitution, and that a constitutional violation did not appear.

Rebecca then brought the present action against the State of Iowa, its Department of Social Services, and various of its employees, alleging Helen's unstable emotional and psychological condition, the danger the condition posed to Rebecca in Helen's home, the State's knowledge of the condition, the failure of the State to intervene, and resultant emotional damage to Rebecca. Further, Rebecca alleged that following the juvenile court's placing her in the custody of the deputy probation officer, the State and its agencies and employees failed to take steps regarding her emotional and physical health, whereby she sustained emotional damage, developed a problem of drug and alcohol abuse, and attempted to take her own life. Rebecca asked for damages under the State tort claims act. Iowa Code ch. 25A (1981). The act provides in section 25A.2(5)(a) and (b) that a "claim" means:

Any claim against the state of Iowa for money only, on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the state while acting within the scope of his office or employment, under circumstances where the state, if a private person, would be liable to the

claimant for such damage, loss, injury, or death.

Any claim against an employee of the state for money only, on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission, except an act of malfeasance in office or willful and wanton conduct, of any employee of the state while acting within the scope of his office or employment.

■ Defendants moved to dismiss the petition on the ground, among others, that it failed to state a claim. A motion to dismiss is sustainable only when the pleadings make certain that the pleader has failed to state a claim on which any relief can be granted under any state of facts provable under the allegations. *Curtis v. Board of Supervisors*, 270 N.W.2d 447 (Iowa 1978). The district court sustained the motion on all grounds, and Rebecca appealed.

In this court Rebecca founds her case on two main bases: (1) the State had a duty to provide for her welfare under the doctrine of parens patriae and breached the duty, and (2) the State is liable by virtue of statute.

■ I. Rebecca argues that the doctrine of parens patriae has always existed, placing a responsibility on the State to care for its citizens. She finds the parens patriae principle reflected in our common law, *In the Interest of Dameron*, 306 N.W.2d 743 (Iowa 1981), as well as in our statutory law. Iowa Code ch. 232, div. III, Child in Need of Assistance Proceedings (1981). She contends that previously private legal actions based on the State's failure to fulfill its responsibility as parens patriae could not be successfully maintained because the State was immune from suit, not because a cause of action did not otherwise exist. Now that immunity has been lifted for tort claims, she argues that a tort action is maintainable.

Underlying Rebecca's reasoning is the assumption that a tort *existed;* only sovereign immunity previously prevented recovery. We think, however, that we must deal with a threshold question: placing the matter of sovereign immunity aside, does a tort exist for a state's alleged failure to act as parens patriae? Iowa has numerous laws, programs, and agencies for the alleviation of human hardship. Social services personnel are continually ministering to the needs of clients throughout the State. If such personnel function negligently and the client does not progress as well as he or she would have done with better care, does a private civil damage action arise against such personnel and the State? Our question is not whether those personnel and the State have a cloak of protection in the form of privilege, but whether the law raises a private damage action in the first place.

In at least one area courts have recognized a cause of action for what might be called social services malpractice: when such personnel place a child or leave a child in a foster home setting which they know or should know is fraught with physical peril to the child. *Vonner v. State*, 273 So.2d 252, 254 (La.1973) (Child beaten to death by foster mother—department ignored prior reports of beatings. "The [dead] child's body was cut and bruised all over.... [Another] child's injuries included: a very noticeable tender red swelling of the right arm, which resulted from a healed (and untreated) fracture of the arm more than three months and up to six months old; a fresh welt-like swelling and inflammation across the left shoulder and shoulder-blade; a small bruise and swelling behind the left ear; the scar of a healed injury across the right rib cage; a fairly recent right rib fracture at least 6 weeks to three months old, still healing."); *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977) (child killed in foster home—similar extreme injuries to those in *Vonner* —question of fact whether department was negligent in selecting the home for placement); *National Bank of South Dakota v. Leir*, 325 N.W.2d 845 (S.D.1982) (two small sisters placed in foster home, foster father sexually abused them, both foster parents also physically abused them, remanded for

trial on merits). *See Walker v. State,* 104 Misc.2d 221, 428 N.Y.S.2d 188 (Ct.Cl.1980).

The present case, however, presents the reverse situation: the charge is that social service personnel negligently failed to place Rebecca permanently in foster homes or elsewhere; she was negligently left exposed to her inadequate mother. Does this give rise to a tort? Not every claimed negligence creates a civil cause of action. *Wagner by Griffith v. Smith,* 340 N.W.2d 255 (Iowa 1983) (nonliability of parent for negligence emanating from parent-child relationship); *Smith v. State,* 324 N.W.2d 299 (Iowa 1982) (nonliability of peace officers for negligently investigating crime). *See Wilson v. Nepstad,* 282 N.W.2d 664, 677 (Iowa 1978) (McCormick, J., dissenting: "It is for the legislature to decide whether municipalities can be trusted to see that their officers, employees and agents perform their statutory duties without the compulsion of municipal financial liability when they do not."). *See also Pottebaum v. Hinds,* 347 N.W.2d 642 (Iowa 1984) (fireman's rule).

In the present case we do not decide whether we would follow the *Vonner* line of decisions involving negligence in placing or retaining children in physically perilous surroundings. Nor do we make a pronouncement on other possible situations which we cannot foresee, involving negligence of social services personnel in exposing children to physical danger. But in the context of the present case we hold that a tort does not arise from the State's role as parens patriae.

■ II. Statutes pertaining to children, such as those on children in need of assistance, Iowa Code ch. 232, div. III (1981), do not evince an intent to create private damage actions under the test in *Seeman v. Liberty Mutual Insurance Co.,* 322 N.W.2d 35 (Iowa 1982). But Rebecca asserts that the General Assembly expressly created a cause of action in cases of the present kind in section 235A.20 of the Iowa Code:

Any aggrieved person may institute a civil action for damages under chapter 25A [State tort claims act] or 613A [municipal tort claims act] or to restrain the dissemination of child abuse information in violation of this chapter, and any person, agency or other recipient proven to have disseminated or to have requested and received child abuse information in violation of this chapter shall be liable for actual damages and exemplary damages for each violation and shall be liable for court costs, expenses, and reasonable attorney's fees incurred by the party bringing the action. In no case shall the award for damages be less than one hundred dollars.

The present case does not involve the dissemination or receipt of child abuse information; it involves the alleged failure to intervene in a family and home alleged to be inadequate. But Rebecca contends that the first clause of section 235A.20—"Any aggrieved person may institute a civil action for damages under chapter 25A"—covers the present case. We do not agree for two reasons: the internal language of the section indicates the section authorizes tort action in the child abuse information context, which is not involved here, and the contents of the chapter in which the section is found similarly so indicate.

The first clause of section 235A.20 which Rebecca quotes cannot properly be isolated from the rest of the sentence in which it is found. The first clause merely gives an aggrieved person a cause of action for damages or for restraint. But then the sentence states the basis for the damages or restraint. The restraint may be to prevent "the dissemination of child abuse information in violation of this chapter...." As to damages, "any person, agency or other recipient proven to have disseminated or to have requested and received child abuse information in violation of this chapter [which relates to a child abuse information registry] shall be liable for actual damages and exemplary damages for each violation...." Thus the dissemination of *child abuse information* may be restrained, and the wrongful dissemination or

receipt of *child abuse information* subjects the violator to damages.

As to the chapter containing section 235A.20, the General Assembly addressed the subject of child abuse in chapter 1162 of the 1974 Iowa Acts. That chapter had two parts, one relating to child abuse reporting, investigation, and rehabilitation, and the other relating to a child abuse information registry. *Id.* §§ 1–10, §§ 11–24. These were placed in the Code as chapter 235A in sections 235A.1–11 and sections 235A.12–24. Iowa Code (1977). Subsequently the two parts were separated. The first part is in sections 232.67–77 and the second part is in sections 235A.12–24 of the 1981 and current Codes.

Chapter 235A of the 1981 and current Codes therefore deals with the child abuse information registry. The sections in the chapter pertain to the creation and maintenance of the registry, access to the registry, requests for information from it, and similar subjects. One of these sections is the provision in question, section 235A.20 on civil actions. That section and the other sections in the chapter are collectively referred to in three other sections of chapter 235A, namely, in sections 235A.12, .13, and .24. Section 235A.12 provides that the purpose of "sections 235A.13 to 235A.24 [which includes section 235A.20] are to facilitate the identification of victims and potential victims of child abuse ...; to facilitate research on child abuse ...; and to provide maximum safeguards against unwarranted invasions of privacy...." Section 235A.13 provides, "As used in sections 235A.12 to 235A.24" the stated terms in the registry chapter, number 235A, have the definitions there set forth. Section 235A.24(3)(a) provides that the council of the registry shall monitor the operation of the registry "established by this section [235A.24] and sections 235A.12 to 235A.23." Section 235A.20 thus appears to be an integral part of the child abuse information registry scheme in chapter 235A, and the causes of action it creates are to be read in that context. It does not reach the case Rebecca presently alleges of negligence in failing to intervene on behalf of a child with an inadequate parent and home.

The two bases of liability Rebecca relies on are unfounded. The trial court properly sustained the motion to dismiss.

AFFIRMED.