Howard ENGSTROM, Dorothy Engstrom, and Michael Engstrom, a Minor Child, by His Mother and Next Friend, Dorothy Engstrom, Appellants,

v.

STATE of Iowa, Joyce Richardson, Margaret Morgan, Anthony Balik, Theresa McCoy, and Dan Ciha, Appellees.

No. 89–1288.

Supreme Court of Iowa.

Sept. 19, 1990.

Rehearing Denied Oct. 17, 1990.

310

John C. Barrett and Emil Trott, Jr. of Barrett & Trott, Des Moines, for appellants.

Thomas J. Miller, Atty. Gen., and Joanne Moeller, Asst. Atty. Gen., for appellees.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SCHULTZ and CARTER, JJ.

SCHULTZ, Justice.

This litigation was commenced by a married couple, Howard and Dorothy Engstrom, and their minor son, Michael Engstrom, against the State of Iowa and five state-employed social workers. Plaintiffs allege several theories of recovery precipitated by the Iowa Department of Human Services' placement of a ten-year-old child, Melody Ehmke, in their home for purposes of an adoption that later failed. The district court sustained defendants' motion for summary judgment·and dismissed the case. We affirm.

Melody was born in California on July 28, 1974, to Denise and Michael Ehmke. The parents later separated, and Denise began

a relationship with Terry Dochterman, a native of Iowa. Dochterman, Denise, and Melody moved to Iowa when Melody was three or four years old.

When Denise was an inmate at the woman's reformatory in 1980, the department commenced a child in need of assistance action in juvenile court. The petition indicated that the father was deceased. Following a hearing, the juvenile court granted the petition and custody of Melody was transferred to the Department of Human Services (department).

In March 1984 the juvenile court terminated Denise Ehmke's parental rights. At the termination hearing, a social worker testified that the files indicated the father was dead and that the child was adoptable.

Michael was not dead and was living in California. Denise and Dochterman gave the social workers information concerning Michael's death. Departmental files indicated that the social workers assigned to Melody's case had doubts about this information but did nothing to ascertain and verify the status or whereabouts of Melody's father. Locating Michael would not have been difficult. In 1979 when Denise applied for welfare benefits, the department's Child Support Recovery Unit located Michael in California at the permanent address of his parents. This information was never provided to the social workers assigned to Melody's case.

After the termination proceeding in 1984, Melody was prepared for adoption. Howard and Dorothy Engstrom had been accepted as potential adoptive parents and the department placed Melody with the Engstroms in November 1984. At that time the department informed the Engstroms that the parental rights of Melody's mother had been terminated and that Melody's father was deceased.

In February 1985 Michael appeared in Iowa requesting custody of his daughter. The State then attempted to terminate Michael Ehmke's parental rights. The juve-

nile court denied this request and initiated a plan to reunite Melody with her father. The department then converted Melody's placement with the Engstroms from preadoption to foster care status. Melody continued to live with the Engstroms on a foster care basis until August 1986 when Melody expressed a desire to live with her father. In January 1987 the department transferred custody of Melody from the department to her father.

In May 1987 the plaintiffs commenced this action in district court after complying with the notice procedures of section 25A.5[1] of the State Tort Claims Act. The district court granted the State's motion for summary judgment and dismissed the case. It concluded that all of plaintiffs' claims arose out of misrepresentation and the State and its employees are immune from suit for misrepresentation under an exception to the State Tort Claims Act. Iowa Code § 25A.14(4)[2].

On appeal, plaintiffs contend that the exception to the State Tort Claims Act is inapplicable because their action is not confined to misrepresentation. They assert that the record supports other theories of liability including (1) several negligence claims for wrongful adoption, including a claim for social worker malpractice; (2) intentional infliction of emotional distress; (3) violation of plaintiffs' substantive and procedural due process rights; and (4) breach of a contract for adoption placement.

Defendants urge two general contentions in a motion for summary judgment and on appeal. First, they urge that the misrepresentation exception to the waiver of sovereign immunity found in chapter 25A effectively precludes their liability. Alternately, they urge that plaintiffs do not have valid causes of action on any of their theories of recovery.

Defendants' reliance upon immunity based on the assumption that all of plaintiffs' claims grow out of misrepresentations presents a serious and difficult issue

---

**1.** Unless otherwise indicated all references to the Iowa Code will be to the 1983 edition.

**2.** This section provides that governmental immunity is not waived on any claim arising out of misrepresentation.

when, as in this case, we are limited to the pleadings and must decide each issue as a matter of law. To make a determination of the applicability of the exception would require examination of each theory of recovery. We prefer to address defendants' alternate argument and determine the validity of each theory of recovery. On appeal, the prevailing party is entitled to affirmance of the judgment based on the validity of other legally sound theories which were presented and considered by the district court. *See Greene v. Friend of Court, Polk County,* 406 N.W.2d 433, 435 (Iowa 1987).

I. *Summary judgment.* The district court sustained defendants' motion for summary judgment. This motion may be sustained only when the moving party shows there is no genuine issue of fact and that the movant is entitled to judgment as a matter of law. Iowa R.Civ.P. 237(c). This burden is upon the moving party. *Meyer v. Nottger,* 241 N.W.2d 911, 917 (Iowa 1976). If the movant has supported a motion, an adverse party must show a genuine issue of fact and may not rest upon the allegations or denials in their pleadings. Iowa R.Civ.P. 237(e).

II. *Breach of contract claim.* The district court declared that it found no allegation of breach of contract in plaintiffs' petition and that defendants raised the contract issue for the purpose of determining whether they had violated any duties owed to plaintiffs. On appeal, plaintiffs assert that a breach of contract for adoption placement is actionable and that a fact question is generated on defendants' breach of implied contractual duties of reasonable care and good faith. Plaintiffs claim that the trial court erred in ruling that defendants were not required to fulfill the adoption agreement.

What is required in alleging a breach of contract action? Our rules prescribing notice pleading reveal a liberal view of pleading which does not require a petition to identify a specific theory of recovery if it informs the defendant of the incident out of which the claim arises and gives fair notice of the general nature of the claim. *Davis v. Ottumwa YMCA,* 438 N.W.2d 10, 13 (Iowa 1989). We do require, however, that the petition give "fair notice" of the claim. *Id.* (citing *Shill v. Careage Corp.,* 353 N.W.2d 416, 420 (Iowa 1984); *Gosha v. Woller,* 288 N.W.2d 329, 331 (Iowa 1980)).

In examining plaintiffs' pleading, we find no indication that plaintiffs provided notice that they were relying on a breach of contract claim. A contract or agreement was never mentioned. The petition detailed compliance with the administrative prerequisites to a state tort claim and specifically alleged that defendants' action constituted negligence, outrageous conduct, and a violation of constitutional due process. In resisting defendants' motion for summary judgment, plaintiffs did claim that the meaning of an "Agreement of Placement for Adoption" attached to defendants' motion for summary judgment raised a fact issue of whether defendants breached its implied duty of good faith. Plaintiffs neither amended their pleadings nor filed affidavits or other proof specifying any further terms of the alleged contract.

Standing alone, the placement agreement does not detail duties and obligations owed by defendants to plaintiffs. The agreement provided that plaintiffs would take Melody in their home and provide for her. In the agreement they acknowledged that the child was under guardianship of the department and that the department "may remove the child from our care if it is believed it is for the best interest of the child." It further stated an understanding that plaintiffs could return Melody to the department prior to adoption if she was unacceptable to them.

Plaintiffs urge that a contract for adoption placement is actionable, relying upon principles set forth in *Petrowsky v. Family Serv., Inc.,* 165 Ill.App.3d 32, 37–38, 116 Ill.Dec. 42, 45–46, 518 N.E.2d 664, 667–68 (1987). The Illinois appellate court indicated that the contracting party vested with contractual discretion must exercise it reasonably and that the adoption agency had an implied duty to carry out the terms of the adoption agreement reasonably and

in good faith. *Id.* In this case, plaintiffs' claims center on allegations of a wrongful adoption placement rather than on a failure to properly exercise contractual discretion in performing the terms of the adoption agreement.

The Illinois court further held that under the placement contract the agency had no legal duty to investigate or verify the child's paternity. *Id.* at 38, 518 N.E.2d at 668. The Illinois court did remand the case for a factual determination on the issue of whether the adoption agency breached its implied duties under the contract by omitting investigation procedures suggested by the plaintiffs. *Id.* Plaintiffs do not make this claim in this case.

Plaintiffs have cited no case decided by this court that provides a contract remedy for breaching an implied duty of good faith in entering a contract. We have, however, imposed duties of good faith on policy grounds in wrongful discharge of employees under an employment-at-will contract; however, we described this action as a tort. *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988). We have also allowed actions against insurance companies for bad faith conduct in denying benefits or settling a claim. Again, we recognized this action as a tort. *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 791 (Iowa 1988).

A contract imposes upon each party a duty of good faith in its performance and enforcement. Restatement (Second) of Contracts § 205 (1981). Bad faith in negotiations of a contract may result in the imposition of sanctions, such as invalidation of the contract if fraud and duress are shown. Additionally, tort remedies may be available for bad faith negotiations. *Id.* comment c; *contra* 3A *Corbin on Contracts* § 654A(C) (Supp.1990). We believe the Restatement position is sound in implying a duty of good faith only in the performance and enforcement of a contract.

We hold defendants owed no duty of implied good faith to establish the father's status when plaintiffs entered the adoption placement contract with defendants.

We conclude that the trial court correctly dismissed a contract theory of recovery.

We have serious doubts that plaintiffs have sufficiently alleged a cause of action for breach of contract. Assuming that plaintiffs' allegation was sufficient, they have not shown a genuine issue of fact on contractual terms that placed a duty on the department to establish whether the father was dead or alive.

III. *Negligence claims.* Plaintiffs allege defendants were negligent in several respects. They point to defendants' actions in improperly hiring and supervising the department's social service staff, misrepresenting Melody as adoptable, failing to investigate Melody's background and locate her natural father, and violating various Iowa statutory and administrative laws governing parental terminations and adoptions. In addition, they maintain that the department's social workers were guilty of malpractice for professional misconduct in placing Melody for adoption.

Claims within the ambit of the State Tort Claims Act are defined as those "caused by the negligent or wrongful act or omission of any employee of the state ..., if a private person, would be liable to the claimant for such damage, loss, injury, or death." Iowa Code § 25A.2(5)(a). The Act does not create a new cause of action, but merely recognizes and provides a remedy for a cause of action already existing which would have otherwise been without remedy because of common law immunity. *Graham v. Worthington*, 259 Iowa 845, 861, 146 N.W.2d 626, 637 (1966). In this case, we need to address the issue of whether defendants' alleged conduct constitutes actionable negligence.

The basis for plaintiffs' negligence claims is that defendants owed them, as preadoptive parents, a duty to exercise due care in placing Melody for adoption. They base their claim of duty on two theories. First, they maintain that this duty arises from Iowa statutory and administrative law governing termination of parental rights, Iowa Code chapter 232, and adoption, Iowa Code chapter 600. Reference is made to Iowa Code chapter 600A, however, these termination proceedings were conducted under the chapter on juvenile jus-

tice, chapter 232, rather than under chapter 600A. Plaintiffs also refer to the administrative code governing departmental adoption practices which requires that: "[T]he department shall place a child in an adoptive home only after parental rights have been terminated...." Iowa Admin.Code 441–200.3(600). They emphasize that the department's manual explains that this administrative code provision is intended to "protect the child, his natural parents, and the adoptive parents." Second, plaintiffs maintain that social workers are under a duty to observe accepted professional standards, and a failure to observe this duty is malpractice.

▐ A fundamental principle of tort law is that violation of a legal right by a wrongdoer is a prerequisite to obtain redress for a claimed wrong. Thus, it is necessary to show a duty owed the injured party by the wrongdoer, and a violation of that duty. *Seeman v. Liberty Mutual Ins. Co.*, 322 N.W.2d 35, 37 (Iowa 1982); *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979). This duty, or standard of conduct of a reasonable person, may be established by legislative enactment or by judicial decision. Restatement (Second) of Torts § 285 (1965). Not every claim of negligence creates a civil cause of action. *Rittscher v. State*, 352 N.W.2d 247, 251 (Iowa 1984). The issue of whether a particular duty arises out of parties' relationship is always a matter of law for the court to decide. *Soike v. Evan Matthews & Co.*, 302 N.W.2d 841, 844 (Iowa 1981).

▐ A. *Implied cause of action.* In light of these principles, we examine plaintiffs' claim that an actionable duty is imposed by statute and administrative rule. Plaintiffs do not claim that the statutes or rule relied upon provides for an express cause of action for wrongful adoption placement. When a statute does not expressly authorize an action, it is a matter of legislative intent whether there is an implied cause of action. *Seeman*, 322 N.W.2d at 40. The narrow issue before us is whether a violation of these statutes or administrative rule provides preadoptive parents with an implied cause of action.

We have not previously addressed this issue, but we have addressed related issues in actions against the State and its social workers.

In *Rittscher*, we held that a child did not have an implied cause of action against the State based on the negligence of a social worker in failing to take steps to remove the child from the home of an abusive parent. 352 N.W.2d at 251–52. We held that the statutes pertaining to children found in chapter 232 "do not evince an intent to create private damage actions under the test in *Seeman v. Liberty Mutual Insurance Co.*, 322 N.W.2d 35 (Iowa 1982)." *Rittscher*, 352 N.W.2d at 251.

We again refused to recognize a tort action against the State and its employees for a failure to take steps to remove a child from the home of an abusive parent. *M.H. By and Through Callahan v. State*, 385 N.W.2d 533, 536 (Iowa 1986). We held that the legislature did not intend to imply a tort action against the State for its employees' failure to thoroughly and promptly report and investigate incidences of child abuse as required by Iowa Code sections 232.67–232.71. *Callahan*, 385 N.W.2d at 537. We noted that there were express statutory actions under chapter 232 for wrongful dissemination of child abuse information and for the knowing failure to report a suspected case of child abuse. *Id.* Observing that express reference to one thing implies exclusion of others, we held that "[i]f the legislature wanted to recognize other statutory violations that would produce civil liability, it would have so indicated." *Id.*

In *Callahan* and *Rittscher*, however, the relevant statutory provisions relied upon by the plaintiffs for an implied cause of action involved child abuse rather than termination of parental rights and placement for adoption. Arguably, *Callahan* and *Rittscher* are distinguishable. Nevertheless, these cases are instructive for the proposition that we are cautious in implying a cause of action or imposing tort liability upon the State and its employees in carrying out their statutory duties in juvenile proceedings governed by chapter 232.

The duties and discretion statutorily required of social workers in child removal situations and foster care placements are not dissimilar to their responsibilities in termination proceedings and adoption placements.

When the legislative intent is unclear, we have resorted to a four-factor test to determine the question of whether a private cause of action exists under a statute. *Seeman,* 322 N.W.2d at 40. The first-factor of the four-part test presents the most relevant inquiry to examine in this case.

The first factor test is whether the plaintiffs are one of the class for whose special benefit the statute was enacted. *Seeman,* 322 N.W.2d at 41. The welfare and best interests of children are paramount in interpreting the termination provisions in chapter 232. *In re J.R.H. and M.J.H.,* 358 N.W.2d 311, 317 (Iowa 1984). Under the termination provisions of chapter 232 adoptive parents have no direct interest. Adoptive parents are considered secondarily in section 600.1 which provides that the welfare of the adopted person shall be given paramount consideration in interpreting this chapter, but that "the interest of the adopting parents are to be given due consideration." Natural parents, on the other hand, are specifically considered in chapters 232 and 600 by entitling them to notice of hearings. *See* Iowa Code §§ 232.112(1), 600.11(2)(a). Under this statutory framework we cannot conclude that preadoptive parents fall within a class for whose special benefit the statutes were enacted.

Neither do we believe that the administrative rule provides aid to the plaintiffs' negligence claims. If we do not imply a cause of action for statutory violations, we likewise refuse to imply a tort from the violation of a rule enacted to carry out statutory directives.

To remain consistent with our holdings in *Rittscher* and *Callahan,* we conclude that preadoptive parents do not have a right to an action implied out of the statutory violations alleged in this case. We conclude that the legislature did not intend to create this private cause of action.

We also believe that public policy reasons do not favor an action by preadoptive parents when an adoption goes sour. "The real basis of negligence is not carelessness, but behavior which society in general views as involving unreasonable risk of harm to others." *Richard P. v. Vista Del Mar Child Care Serv.,* 106 Cal.App.3d 860, 866, 165 Cal.Rptr. 370, 373 (1980) (citing W. Prosser, *Torts* § 31, at 148–49 (3d ed. 1964)). The time from initial placement of a child in a home to final adoption is a short period in the long range scheme of permanent adoption. During this preadoptive period, the state and adoptive parents have the opportunity of sifting out potential problems that may arise from a permanent adoption. While the placement may cause lofty anticipation, realism demands a cautious expectation. The placement of the child does not insure success; a multitude of problems may need solving. Under this scenario involving a relatively short period of time with some uncertainty as to success, we conclude that society does not demand a civil remedy for alleged wrongful behavior that does not include fraud, willful intent to harm, or physical injury. We hold that preadoptive parents should not have an action for negligence arising out of placement of a child later determined to be unadoptable.

■ B. *Social worker malpractice.* Plaintiffs contend that defendants' conduct gives rise to a common law cause of action for social worker malpractice. Damage actions against social workers are a relatively recent phenomenon and have arisen primarily during the past two decades. *See* Levine, *Social Worker Malpractice: A New Approach Toward Accountability in the Juvenile Justice System,* 1977 Journal of Juvenile Law 101. We have not yet embraced a malpractice cause of action against state social workers. *See Callahan,* 385 N.W.2d at 540; *Rittscher,* 352 N.W.2d at 250–51.

To date, few jurisdictions have expressly adopted a "social worker malpractice" cause of action in the context of negligent

placement or supervision of children in adoption and foster care situations.[3] Illinois, New York, and South Dakota have addressed specifically "social worker" or "adoption agency" malpractice. New York recently recognized a cause of action against a child welfare agency and its employees for social services malpractice in *Dunn v. Catholic Home Bureau,* 142 Misc.2d 316, 318–19, 537 N.Y.S.2d 742, 743 (Sup.Ct.1989). In *Dunn,* the plaintiff mother claimed that she was wrongfully deprived of custody of her infant child. *Id.* The court based its decision on a statute prohibiting professional misconduct. *Id.*

Illinois has refused to recognize a cause of action for "adoption agency malpractice." *Petrowsky v. Family Serv.,* 165 Ill. App.3d 32, 35, 116 Ill.Dec. 42, 43–44, 518 N.E.2d 664, 665–66 (1987). In *Petrowsky,* the court declined to find a cause of action when preadoptive parents sued a private adoption agency for alleged shoddy paperwork and investigation regarding paternity of the adoptive child. *Id.* Illinois has, however, recognized social worker malpractice in the context of a social worker functioning as a counselor or psychotherapist. *See Horak v. Biris,* 130 Ill.App.3d 140, 85 Ill.Dec. 599, 474 N.E.2d 13 (1985); *see also* cases cited *supra* note 3.

South Dakota has not expressly used the terms "social worker malpractice" or "adoption agency malpractice" but the supreme court held that sovereign immunity precluded a suit by minors against social workers in their individual capacity for alleged negligent placement and supervision in a sexually abusive foster home. *National Bank v. Leir,* 325 N.W.2d 845, 847 (S.D.1982).

Even though these cases are relevant to our determination, they are not exactly on point. The present case presents the question of whether social workers owe an actionable duty to preadoptive parents to determine whether a natural parent is alive or dead. Does a failure in this respect give rise to a tort of negligence grounded on professional malpractice? We think not. We rely on the policy reasons that we previously discussed to determine whether or not the statutes give rise to negligence. Consistent with *Rittscher* and *Callahan,* we refuse to recognize that the present cause of action is an actionable malpractice claim.

**IV.** *§ 1983 Claim.* Plaintiffs allege that the defendants violated their "rights to due process as guaranteed by the U.S. Constitution, 42 U.S.C. section 1983, and the Constitution of the State of Iowa." Section 1983 furnishes a cause of action in damages to vindicate deprivations of federal constitutional rights caused by persons acting under color of state law.

A valid cause of action for violation of the due process clause of the fourteenth amendment under section 1983 requires a showing that plaintiffs suffered deprivation of a recognized liberty or property interest within the meaning of the fourteenth amendment and that they were deprived of that interest under color of state law. *See Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548, 557 (1972). Clearly, the department's social workers were acting under color of state law in placing Melody for adoption. The Supreme Court has stated that the first inquiry in a due process violation claim is "a determination of the precise nature of the private interest that is threatened by the State." *Lehr v. Robertson,* 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614, 623 (1983). Now we must examine whether the plaintiffs in this case possess a recognized constitutionally protected interest.

---

**3.** Social workers who function as marriage counselors and psychotherapists may be held liable for malpractice. *See, e.g., Horak v. Biris,* 130 Ill.App.3d 140, 85 Ill.Dec. 599, 474 N.E.2d 13 (1985); *Rowe v. Bennett,* 514 A.2d 802 (Me. 1986); *cf. Martino v. Family Serv. Agency,* 112 Ill.App.3d 593, 445 N.E.2d 6 (1982). This line of cases is distinguishable from cases involving adoption because there is a clear therapist-patient relationship analogous to a physician-patient relationship and an indisputable duty of care giving rise to a negligence cause of action if that duty is breached. For a discussion of social worker malpractice in the therapist-patient context, see Annotation, *Social Worker Malpractice,* 58 A.L.R. 4th 977 (1987).

A. *Liberty interest of preadoptive parents.* Plaintiffs argue that, as preadoptive parents, they enjoy a liberty interest in "personal family integrity and privacy." The Supreme Court has established substantive and procedural constitutional protection for "the private realm of family life which the state cannot enter." *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944). In addition, plaintiffs claim that defendants created a "special relationship" with plaintiffs when they placed Melody with them for a presumably permanent adoption.

The United States Supreme Court has not addressed whether adoptive parents have protected interests under the due process clause of the fourteenth amendment. The Court has discussed, but not decided, whether foster parents are entitled to the same constitutional deference as biological families based on a recognized liberty interest in family privacy. *Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 838–47, 97 S.Ct. 2094, 2106–11, 53 L.Ed.2d 14, 31–37 (1977). The Court stated that "biological relationships are not exclusive determination of the existence of a family." *Id.* at 843, 97 S.Ct. at 2109, 53 L.Ed.2d at 34. It did not dismiss the possibility that a foster family could fulfill the functions of a biological family and enjoy the same constitutional protection as a biological family but hypothesized about the conflict that would arise if a liberty interest was recognized for foster parents. For instance, if a child is removed from foster parents and returned to natural parents, then the liberty interests of natural and foster parents would be competing for the same family relationship. *Id.* at 846–47, 97 S.Ct. at 2110–11, 53 L.Ed.2d at 36–37.

In this case, plaintiffs make their claims as preadoptive parents, even though they had been converted to foster parent status when the department learned that Melody's father was not dead. The recognition of a liberty interest in familial privacy for either preadoptive or foster parents raises the same potential problem contemplated by the *Smith* Court—the competing interests of natural and preadoptive parents if both

were to enjoy a liberty interest in the same familial relationship. In this case, competing claims to the same familial relationship did arise when Melody's biological father returned and wanted custody of his daughter.

The Fifth Circuit recently addressed the liberty interests of adoptive parents. In *Griffith v. Johnston*, 899 F.2d 1427, 1432 (5th Cir.1990), adopted children and adoptive parents alleged that the Texas Department of Human Services violated their due process rights by failing to release crucial medical and social background information to the adoptive parents and by failing to provide adequate postadoption services. The adoptive parents argued that the State's failure to provide complete information about their adopted children's background interfered "with their 'fundamental interest' in deciding to adopt because it violated their right to 'informed' decision-making on behalf of their family." *Id.* at 1437. In denying the liberty interest claim, the court noted that the Supreme Court has not recognized a fundamental interest in adopting children. *Id.* The court raised a question similar to the one raised by the *Smith* Court: "When does the 'fundamental right to adopt' overcome the right of privacy of the birth parents?" *Id.* If a fundamental right to adopt is recognized, then society would have to balance the interests of birth parents, adoptive parents, and child during the adoption process. *Id.*

This case is analogous to *Griffith* because the plaintiffs are alleging they did not receive crucial information about Melody's family background. In *Griffith*, the plaintiffs alleged they were not provided crucial background information about their adopted children's prior physical, sexual, and emotional abuse; and their medical history, needs, and physical handicaps. *Griffith*, 899 F.2d at 1434. In this case, plaintiffs were not told either that Melody's father was still alive or that the department had doubts about his presumed death. In both *Griffith* and this case the information withheld was crucial to the prospective adoptive parents' decision to adopt. It is important to note that in *Griffith* the adop-

tion was final and the plaintiff-parents were already adoptive parents, whereas in this case the plaintiffs were preadoptive parents. Since the Fifth Circuit declined to find a liberty interest for adoptive parents it seems logical that preadoptive parents should not enjoy a liberty interest in a prefamilial relationship with a child. We now turn to the question of whether plaintiffs possessed a property interest within the meaning of the due process clause.

■ B. *Property interest of preadoptive parents.* Plaintiffs can still state a claim under the due process clause if defendants deprived them of a recognized property interest. "The hallmark of property ... is an individual entitlement grounded in state law which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265, 274 (1982). Plaintiffs assert that defendants deprived them of a property interest in continued care of Melody and their property interests in expenditures of approximately $20,000 per year when plaintiffs were misled to believe that the adoption would occur after the department already knew that Melody's father was alive.

We find that plaintiffs' assertion of a property interest has no merit. The Fifth Circuit, in *Griffith,* refused to find a property interest in the monetary resources that adoptive parents spent in caring for their hard-to-place adopted children. *Griffith,* 899 F.2d at 1440. The court reasoned that "[t]he parents elected to adopt hard-to-place children and could have anticipated that the expenses to care for their children would exceed those for a normal child." *Id.* The court noted the potential for any adoptive parent to claim that the state should subsidize them for expenditures that exceeded the amount anticipated. *Id.*

In this case, the plaintiffs, unlike the plaintiffs in *Griffith,* were preadoptive rather than adoptive parents, thus making plaintiffs' property interest deprivation argument quite tenuous. Arguably, state law protects plaintiffs' ownership of their monetary resources. Neither the department nor state law, however, required

plaintiffs to spend a certain amount of money per year on Melody. Since plaintiffs elected to spend their money on Melody it is difficult to find that the department deprived plaintiffs of their monetary resources by placing Melody in their home.

■ C. *Special relationships.* Plaintiffs claim that the defendants took affirmative action to create a special relationship with them by placing Melody in their home for adoption. They claim this special relationship creates a constitutional duty on the part of defendants to act with due care and provides them with substantive due process protection.

We find no merit in plaintiffs' special relationship argument. A special relationship exists when the State takes a person into its custody or if the "affirmative exercise of [the State's] power so restrains an individual's liberty that it renders him unable to care for himself ...." *DeShaney v. Winnebago County,* 489 U.S. 189, 200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249, 261–62 (1989) (no special relationship with child not in custody of state and living with father at time of injuries). The Court also explained that a duty can arise when the state limits the ability of individuals to act on their own behalf, and "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him...." *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1006, 103 L.Ed.2d at 262.

Plaintiffs were not in the custody of the State. Therefore, to find a duty based on the special relationship doctrine would require a finding that defendants' conduct prohibited plaintiffs from acting on their own behalf. In this case, plaintiffs could act on their own behalf because they were free to back out of the adoption agreement if Melody's placement in their home did not work out. Thus, to find that plaintiffs in this case enjoyed substantive due process protection based on the special relationship doctrine would be an unwarranted extension beyond the doctrine's requirement that plaintiffs be restrained to act on their own behalf or be in the State's custody. *Id.*

D. *Procedural due process.* Procedural due process would only be required after

a finding that plaintiffs were deprived of a life, liberty, or property interest protected by the due process clause. We make a finding to the contrary. We hold that plaintiffs' theory of recovery based on a violation of due process must fail.

V. *Infliction of severe emotional distress.* Plaintiffs maintain that their claim for intentional infliction of severe emotional distress or outrageous conduct is supported by the record. They argue that we have held this action is within the context and jurisdiction of the courts under chapter 25A. *See Callahan,* 385 N.W.2d at 538–39. They urge that proof of the elements of outrageous conduct and the suffering of severe emotional distress is a question of fact to be resolved by trial.

Both parties concede that an element of the tort of intentional infliction of emotional distress is outrageous conduct by the defendants. For conduct to be outrageous it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Vinson v. Linn–Mar Community School Dist.,* 360 N.W.2d 108, 118 (Iowa 1984) (citations omitted). We believe that the record submitted in the motion for summary judgment supports a decision on the outrageous conduct element as a matter of law.

We hold that the conduct relied upon by the plaintiffs in their resistance to summary judgment does not rise to the level of outrageous conduct. The evidence shows negligence in failing to search for Melody's natural father. There is no showing that any of the social workers knew he was alive. At most, the social workers were suspicious that the mother and her male companion might be lying. Any negligence that might have been committed in the termination proceedings or in placing Melody for adoption without a more thorough investigation into the father's status does not meet the definition of outrageous conduct. Neither do we believe that the act of telling the preadoptive parents that the father was dead without verifying his death is outrageous conduct. The district court did not err in dismissing this tort action.

VI. *Conclusion.* The circumstances which led plaintiffs to commence this lawsuit are, indeed, tragic. Concededly, defendants should have exercised more care and determined whether Melody's father was dead or alive. Our task, however, is to determine whether this conduct is actionable.

In this case, to determine that the trial court erred in granting summary judgment would require us to find a constitutional liberty or property interest of which plaintiffs were deprived, or a common-law or statutory state tort law duty owed to plaintiffs as preadoptive parents. We hold that plaintiffs have not been deprived of a constitutional interest. Under Iowa tort law, we hold plaintiffs do not have a cause of action.

AFFIRMED.