Richard DRESSER and Marilyn Dresser, Husband and Wife, and as Next Friend of Mikhail Robert Dresser, a Minor Child, Plaintiffs,

v.

CRADLE OF HOPE ADOPTION CENTER, INC., a Maryland corporation, and All Ways International, Inc., a New York corporation, Defendants.

No. 03–CV–10083–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Feb. 24, 2005.

Christopher A. Swartz, Swartz & Wilson, Russell C. Babcock, Mastromarco & Jahn (Saginaw), Saginaw, MI, for Plaintiffs.

Patrick L. McCarley, Ralph C. Chapa, Jr., Kaufman & Payton, Farmington Hills, MI, Lawrence J. Murphy, Honigman, Miller, (Detroit), Detroit, MI, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING OTHER PENDING MOTIONS AS MOOT

LAWSON, District Judge.

Richard and Marilyn Dresser, husband and wife, have filed an action for themselves and on behalf of their newly-adopted, Russian-born son, Mikhail, against the adoption agency that arranged the foreign adoption and a travel agency affiliated with it. The Dressers allege that the defendants misrepresented the state of Mikhail's health before the Dressers committed to adopting him, and Mikhail subsequently developed medical conditions that

have caused them great expense in time, money, and emotional distress as a result of the necessary medical treatments and ensuing disabilities. They contend that the adoption agency, and particularly the Russian adoption coordinator introduced to them by the agency, withheld information about Mikhail's health history and condition that should have been disclosed. The Dressers have alleged fraud, negligence, negligent infliction of emotional distress, and breach of contract in claims brought on their own behalf. They also have brought a claim on behalf of Mikhail alleging that the defendants were negligent in conveying his medical information so that it could be considered in determining subsequent medical treatment. The defendants have filed a motion for summary judgment contending that the evidence adduced during discovery does not establish fraud, the negligence claims are barred by a waiver provision in the adoption agreement, and the contract was not breached because it specifically provided that the defendant could not guarantee a healthy child. The Court heard the arguments of the defendants in open court on October 7, 2004. Plaintiffs' counsel responded to questions but did not present an oral argument because his answer to the motion was filed well past the filing deadline. The matter is now ready for decision.

The Court finds that there is a material fact issue as to whether the Russian adoption coordinator with whom the Dressers dealt in Russia was an agent of defendant Cradle of Hope Adoption Center, Inc. Nonetheless, the record establishes without question that the principal ailment from which Mikhail suffers could not have been known to the defendants before the adoption, the Dressers had information from which they could have concluded that Mikhail otherwise was not healthy before they completed the adoption, the Dressers' own negligence claims are barred by the waiver language, and the defendants did

not breach their contracts with the plaintiffs. However, the negligence claim brought on behalf of Mikhail is not barred by the waiver language since Mikhail was not a party to the contract, and there is a material fact question whether defendant Cradle of Hope breached a duty to the boy to deliver his medical records within a reasonable time. Therefore, the Court will grant the defendants' motions for summary judgment as to the claims by the Dressers, and all claims against defendant All Ways, but deny the motion as to the negligence claim on behalf of Mikhail against Cradle of Hope.

## I.

As the Dressers certainly have learned, the adoption of children, especially children from foreign countries, is a noble and risky undertaking. In 1999 when the Dressers decided to expand their family, they already had two children of their own, a daughter who was their biological child and a son whom they adopted from Guatemala in 1993. The Dressers, who live in Bay City, Michigan, had seen a newsletter from the Jewish Children's Adoption Network and took notice of a picture of a "smart, healthy and handsome" Russian boy, Mikhail, who resembled Ms. Dresser's mother. Pls. Opp. to Dfs. Mots. Summ. J. Ex. 6, Adoption Newsletter. Mikhail was three years old at the time, born November 27, 1996. The Dressers decided to pursue adoption and, with the information from the newsletter, they contacted defendant Cradle of Hope.

Defendant Cradle of Hope Adoption Center, Inc. is a non-profit Maryland corporation that assists in international adoptions from its principal place of business in Silver Springs, Maryland. Defendant All Ways International, Inc. is a New York corporation with a principal place of business in New York City. All Ways provides

services in support of adoptions arranged by Cradle of Hope, such as airplane flights, translators, and drivers.

Plaintiff Marilyn Dresser contacted Cradle of Hope and spoke with its executive director, Linda Perilstein. Their first conversation lasted forty-five minutes, and Perilstein later provided the Dressers with two photographs, a videotape, and a three-page medical summary translated from Russian about Mikhail and information about another boy. The medical summary included the disclaimer, "MEDICAL ACCURACY NOT GUARANTEED/ TRANSLATION NOT GUARANTEED." Cradle of Hope Mot. Summ. J. Ex. 12, Medical Summ. at 3. The medical summary disclosed that Mikhail had a pathological delivery by Cesarean section, lived in a specialized orphanage, had an Apgar score of 2/8 at birth, had an additional toe removed at birth, and exhibited "[p]erinatal encephalopathy" and "[d]elay of psychomotor development." Id. at 1–2. The summary described Mikhail's psychomotor status as follows:

> The boy is quiet, curious and well balanced. He likes to study very much, carries out all the commissions, he is neat and diligent. He sings and dances on musical lessons, feeds himself, asks to be put on the potty, dresses himself, walks very well and runs. He speaks many words and attempts to construct simple sentences.

Id. at 2. The summary also mentioned that Mikhail was "very good, smart, and handsome." Ibid. Cradle of Hope telefaxed a description of encephalopathy to the Dressers that characterized the condition as "a disease of the brain" that "in the first week(s) of life appears to be used in Russia to describe a considerable number of infants with minor/transient signs which would not be considered to be significant." Pls. Opp. to Dfs. Mots. Summ. J. Ex. 11, Encephalopathy Description.

Marilyn Dresser then sought the advice from their local family pediatrician, Dr. Jeffery VanGelderen, who saw "no evidence of an obvious medical problem" with Mikhail from the information provided. Pls. Opp. to Dfs. Mots. Summ. J. Ex. 6, VanGelderen Letter. The Dressers also discussed the medical summary with Mrs. Dresser's sister, a psychiatrist. Cradle of Hope Mot. Summ. J. Ex. 3, Marilyn Dresser Dep. vol. I at 97, 98.

The Dressers had approximately six more conversations with Perilstein. Marilyn Dresser allegedly informed Perilstein about their financial stresses and their need to borrow money for the adoption. The Dressers rejected Perilstein's offer of a special needs child from Moscow named Masha at a discounted cost. The Dressers allege that Perilstein claimed that she had frequent contact with Cradle of Hope's adoption coordinator and the orphanage in the region and repeatedly confirmed Mikhail's health. See Pls. Opp. to Dfs. Mots. Summ. J. Ex. 1, Perilstein Dep. at 267. At some point, Perilstein allegedly called the Dressers and said that several Russian families were interested in adopting Mikhail and the a decision must be made soon. With Perilstein's alleged assurances about Mikhail's health, the Dressers agreed to proceed with adopting Mikhail.

On July 25, 1999, Richard and Marilyn Dresser signed an Adoption Services Agreement provided by Cradle of Hope, referred to as "CHAC" in the document. The agreement read in part as follows:

> 3. *Statement of Risks:* Clients understand that there is risk in foreign adoption and that while CHAC will diligently pursue the completion of an adoption for Clients, CHAC cannot control all aspects of the process nor assure a successful outcome. In the event of any occurrence which impedes the successful outcome of an initial adoption effort, CHAC

will work with Clients toward alternative adoption options. Clients understand that neither the execution of this agreement nor the provision of some or all of CHAC's services guarantees the placement of a child.

4. *Background Information:* CHAC will furnish Clients all medical and social information available to it pertaining to any child offered to Clients, but cannot guarantee that any child is or will be healthy or that the medical information provided will be accurate or complete. Clients understand that their child could arrive with undiagnosed physical, mental, emotional, and/or developmental problems.

5. *Statement of Understanding Regarding Health Status of Children:* CHAC clients who are interested in adopting a child from the former Soviet Union or Eastern Europe understand that in some areas the governments will allow foreign families to adopt only those children who are not considered to be at greater risk due to genetic factors, such as alcoholism or mental illness in the birth family, and children with health issues.

Clients understand that the children placed by CHAC may have medical problems or congenital defects, some of which may not be readily apparent at the time of placement or which may not be discovered by physicians in the country of origin. These problems include, but are not limited to: difficulties at birth, prematurity, low birth weight, allergies, crossed eyes, hepatitis carriers, cleft lip and/or palate, asthma, cardiac problems, mental or emotional problems, congenital hip problems, and developmental delays. Clients understand that they are not obligated to accept any particular child offered to them.

6. *CHAC Fees:* Clients agree to pay CHAC an agency fee of $2,500 to $5,750, depending on the program, and a $100 expense fee ($750 for families residing outside the U.S.), for adoption services in connection with the adoption of one child or siblings. This fee shall be paid in installments as follows:

| | |
|---|---|
| $ 500 | Upon submission of application; |
| $ 1,600 | Upon submission of this agreement; and |
| Balance of fee | Upon submission of documents. |

7. *Foreign Program Fees:* In addition to CHAC's fees, Clients will pay a foreign program fee between $3,500 and $15,500, depending on the program. The amount of the foreign program fee in each adoption will be established prior to the acceptance of a child referral and will be paid once a child referral is accepted. Clients understand that the foreign program fee may be increased, but not once a child referral has been accepted.

. . . . .

20. *Waiver of Claims:* Clients hereby waive any and all claims they may have now or in the future against CHAC and its directors, officers, employees and agents, including doctors. Clients agree to hold CHAC and its directors, officers, employees and agents, including doctors, harmless against any claims known or unknown now existing or in the future, which may arise out of this agreement, receipt of services from, or adoption through CHAC.

Cradle of Hope Mot. Summ. J. Ex. 6, Adoption Agreement.

In addition to the contract, the Dressers signed a "Statement of Understanding the Russian Adoption Process" that stated repeatedly the Dressers could change their mind concerning the adoption, but provided a schedule of fees for withdrawing from the process at its various stages.

1. Once I inform Cradle of Hope Adoption Center (CHAC) that I have accepted a particular child or children referred to me, the next steps of the adoption

**626**

process are begun in the U.S. and overseas. If I change my mind prior to the scheduling of a court date, I will forfeit $1,500 of the foreign source fee.

2. If I change my mind about proceeding with the adoption after a court date has been scheduled, I will forfeit $2,500 of the foreign source fee.

3. I understand that I will meet my child(ren) prior to the court hearing. If I have any concerns or hesitations about proceeding with the adoption hearing, I will discuss them immediately with my coordinator and CHAC social worker. In the event that I choose not to proceed with the adoption hearing, I will forfeit $2,500 of the foreign source fee.

4. Once I have appeared in court and confirmed my desire to adopt the child, the adoption decree will be issued and will be final and binding. In some regions, the court will impose, or I may request during the adoption hearing, a ten day appeal period during which time I may change my mind about the adoption. If I decide not to complete the adoption during the ten-day appeal period, I will forfeit $3,500 of the foreign fee.

Cradle of Hope Mot. Summ. J. Ex. 14, Adoption Process Statement.

As the process went forward, the Dressers allegedly paid a company called M.G. Services $950 for the translation of their adoption documents from English to Russian. Cradle of Hope provided the Dressers with the "CRADLE OF HOPE TRAVEL PACKAGE" that gave guidance for adoption preparations and the trip to collect the adopted child. Cradle of Hope recommended that All Ways be contacted to arrange for travel:

We have enclosed a list of travel agencies which have been helpful to CHAC families. Some of them specialize in adoption travel, while others are very knowledgeable about travel in Russia. Many families have made their travel plans through All Ways International. All Ways is owned in part by the coordinator of our Russian program. However, All Ways can only answer questions about your transportation and visas. Please continue to direct any adoption questions to CHAC. Please understand that you are free to use any travel agent that you choose and that CHAC receives no benefits from referring you to any particular travel agency. We do so only because their fares have been reasonable and many of our families have been pleased with their services.

Pls. Opp. to Dfs. Mots. Summ. J. Ex. 7, Adoption Information Package at 2. The package included information that All Ways and Cradle of Hope share an office in Moscow, where the Dressers could go if there was a problem. *Id.* at 6. The trial package also discussed an appeal period after the Russian court hearing and before the adoption became final. It explained that "[t]he appeal period is not intended as a time frame for you to make up your mind." Pl. Opp. Dfs. Mot. Summ. J. Ex. 7, Adoption Information Package at 13. The package also provided a description of the people who work with the adoptive parents in Russia:

4. *Russia Staff*

Our coordinators in Russia will be responsible for you and your adoption process while you are in Russia. We know and rely on the people who work for us and so should you. CHAC operations in Russia are headed by Alexander Melnikov, a kind and quiet man who has overall responsibility for your trip. We have coordinators in each city who are responsible for the timely completion of the adoption steps that occur in their jurisdiction. Therefore, families adopting children outside Moscow will have a coordinator in Moscow during their way

in, then a different coordinator in their child's hometown, and the same initial coordinator upon returning to Moscow at the end of the trip. Your social worker will be able to tell you some information about the coordinator you will be working with in your child's city. We usually do not know which coordinator will be assigned to you in Moscow ahead of time. Both in Moscow and in your child's city, you will be provided with a translator and car/driver as well.

Your coordinator is your closest ally, the person who works the hardest and cares the most that you go home soon and happy. Your coordinators will be highly educated professionals unable to support their families on the salary they would earn in their profession in a struggling Russia. Trust this person! Don't question their motives or mode of operation. It may be different from ours, but they get the job done. CHAC has a lot of confidence in your coordinator and you should too.

*Id.* at 7. Despite the language in the travel package about various travel options, the Dressers allege that Cradle of Hope informed them that All Ways would arrange drivers, translators, and travel assistance. All Ways billed the Dressers $9,147.50 for "Adoption Related Services" and "Travel Services" prior to their departure for Russia. Pls. Opp. to Dfs. Mots. Summ. J. Ex. 18, All Ways Invoice. The adoption related services included the costs of humanitarian aid, state fees, service in Moscow, service in Birobidjan, trips between Khabarovsk and Birobidjan, and "Transfers: 4 regular @ $55." *Ibid.* Travel Services included the costs of travel tickets, hotel rooms, and service charges and fees. *Ibid.* The Dressers paid Cradle of Hope's fees, and Cradle of Hope paid a service to arrange the adoption in Russia. The Dressers allege that Cradle of Hope paid M.G. Services approximately $8,000 for coordinating the Russian portion of the adoption

and that the adoption coordinator, Tatyana Kostko, received approximately $5,000 for her role.

The orphanage where Mikhail lived was in the Russian city of Birobidjan. The Dressers flew there from Moscow on February 8, 2000, and an All Ways driver took them to the orphanage. Cradle of Hope alleges that an interpreter named Lyudmila was present for them at all times in the orphanage. The Dressers were introduced to the director of the orphanage, Natayla; their adoption coordinator, Tatyana Kostko; and a doctor on the orphanage's staff. The Dressers met Mikhail soon after their arrival. Mikhail had lost about ten pounds from when he was filmed for the videotape. Over the next few days, the Dressers acquainted themselves with Mikhail. The orphanage director discussed Mikhail's medical records with them through their interpreter. The Dressers' asked for the complete medical records on several occasions but the orphanage director refused the requests. However, they acknowledge that the orphanage director and the adoption coordinator reviewed Mikhail's medical chart with them on their third day there. Marilyn Dresser testified:

Q. During those meetings, did anybody ever give you a reason why you weren't being provided a complete set of records?

A. No, but Natalya and Tatyana had both gone through them with us page by page.

Q. So you did go through the entire chart while you were there?

A. What we knew to be the chart.

Q. Okay. What was represented to you to be the entire chart, you went through page by page, right?

A. It was not ever represented to us to be the entire chart, because his file was bigger. They had took part out of it to talk to us.

Cradle of Hope Mot. Summ. J. Ex. 7, Marilyn Dresser Dep. at vol. I, 88. She also stated:

> Q. Did you undertake at that time in Russia to review the records that the orphanage had?
>
> A. We asked to see the file. We were told we could not see it, but they would show us the important parts that we needed to see, or they would discuss it with us.

*Id.* at 115.

The Dressers observed that Tatyana Kostko appeared to be well known at the orphanage and to have access to the building and the orphanage's files. Richard Dresser took notes during the meeting with Kostko to prepare for the adoption hearing when Mikhail's medical history as described in orphanage's medical file was discussed. The notes state:

> c-section birth—5 pregnancy & 3rd birth
> Surgery 7 months old to remove a growth from left ? ?
> Colds when young but overcame them chicken pox
> muscular hypotension
> diagnosis perinatal ensepelopathy [sic] prior to 2 yrs. old
> after 2 yrs old changed to slow development
> shy, quiet child who is not a behavior problem
> 4 kids in his group sick w/ flu & concerned with he catching it
> has now had his 2nd hepatitis shot & will need the 3rd shot in 6 months
> TB tests all negative
> Weight 3 kilo 80 grams
> 5 days old transferred to children's hospital
> Diagnosis was birth trauma of spinal cord in the neck
> Got treatment and by 2 months overcome it
> A[sic] 7 months surgery for growth on left hand
> Stayed in children's hospital til ?0 months old
> Mother born in 1970—was 26/23 when he was born
> Father—no information
> When brought to orphanage could sit & walk
> ? ? holding
> Started to walk 1 yr 3 months
> Got all vaccinations necessary
> All tests negative hep venereal HIV no worms
> Speech problem—doesn't speak in complete sentences yet
> As of ? ? had diagnosis of perinatal ensephelopathy[sic]
> No longer has—now diagnosis of slower development

Cradle of Hope Mot. Summ. J. Ex. 13, Richard Dresser's Notes at 1–2.

Kostko also instructed the Dressers on what to say during the Russian court hearing, which was held a few days later. As instructed, the Dressers told the judge that they did not utilize Cradle of Hope to find Mikhail and exaggerated the amount of time that they had been in the region. The judge enforced the ten-day appeal period during which the Dressers had to stay in the area. During the ten days, the Dressers spent time each day with Mikhail. Marilyn noted that Mikhail exhibited delayed development, had a pronounced droop on the left side of his face, was not toilet trained, and had a parasite infection. Richard did not consider Mikhail sick, but observed the boy throwing up. The Dressers never complained about Mikhail's medical problems that they observed. They insist that during this time they were trying to avoid looking like "ugly Americans" as instructed by Cradle of Hope.

After the waiting period ended and before the end of February 2000, the Dressers took three-and-a-half-year-old Mikhail with them to the United States. The Dressers eventually obtained Mikhail's complete medical file consisting of twenty-six pages that document Mikhail's medical condition from 1997 through 2000. The medical records contained information regarding Mikhail's vaccinations, growth, sicknesses, and examinations, and they showed that Mikhail suffered a traumatic birth and a stormy medical course during his early years. They showed that although Mikhail was delivered at a normal birth weight, his Apgar score was 4/6, he exhibited birth injuries to the brain and cervical spine, and he was placed in intensive care. He suffered acute respiratory distress on two occasions and at eight months had surgery to remove a sixth finger on his left hand. At one year he was described as active, mobile, and responsive but he did not make sounds or speak. He had a slight asymmetry of the face; the diagnosis of perinatal encephalopathy was made with delay of psychomotor development. At two years, Mikhail had grown stronger, walked and ran, used the "potty," and exhibited no pathological signs. He still did not speak, and the diagnosis of the previous year was repeated. A third-year examination report states:

Misha is 3 years old. He has grown and got stronger. The child is active and lively; he understands addressed speech and follows simple commands. He has a quiet and balanced character. Sleep and appetite are normal. The child speaks. In the cranial nerves no pathology has been found. Active movement in the extremities are normal. There is no paresis in the extremities. Deep reflexes in the upper and lower limbs are brisk on both sides. There are no pathological signs. All types of sensitivity are normal. There is some delay in psychomotor development. Intellectual reserve is limited.

Doctor: *Signature:*

Pls. Opp. to Dfs. Mots. Summ. J. Ex. 13, Translated Medical Records at 25.

Upon his arrival in Bay City, Dr. VanGelderen, the family pediatrician, examined Mikhail and initially diagnosed him as a physically healthy child. The doctor testified:

Q. And at that time what were the results of your finding, Doctor?

A. With well child care he had an essentially normal exam. We gave him some vaccines.

Q. Okay.

A. Did some routine screening we do in the cases of international adoptions.

Q. Is it fair to state that based upon your examination at the time that Mikhail appeared to be a healthy child for his age?

A. Yes. We could not completely assess his development because he didn't speak English.

Q. Okay, but from a physical standpoint?

A. But physically, yes.

Cradle of Hope Mot. Summ. J. Ex. 23, Dr. VanGeldern Dep. at 16–17.

In August 2000, Mikhail began to exhibit symptoms of persistent vomiting, headaches, and a gait disturbance. After an MRI study, Mikhail was diagnosed with a medulloblastoma, a malignant brain tumor, on September 7, 2000. Dr. Patricia Robertson, a pediatric neurologist, then took charge of Mikhail's medical care. Following surgery to remove the tumor, Mikhail experienced some moderate balance and coordination problems, but Dr. Robertson considered his recovery fairly swift. Cradle of Hope Mot. Summ. J. Ex. 15, Patricia Robertson Dep. at 26. Approximately four weeks after surgery, Mikhail was treated

with a six-week course of radiation and chemotherapy that included weekly doses of the drug vincristine. *Id.* at 26–27. Mikhail experienced complications as a result of the chemotherapy because of the medical course that included drugs considered toxic in large doses, namely vincristine, cisplatin, and cyclophosphamide. The most grave complication occurred with the onset of neuropathy: Mikhail could not walk and "couldn't use his hands except as claws." *Id.* 42–43. Dr. Robertson attributes the cause of the neuropathy to the drug vincristine. It was after Dr. Robinson started Mikhail on his course of chemotherapy that the Dressers received the complete medical file from Russia.

To address that complication, Dr. Robertson consulted with national specialists to develop an individual treatment program for Mikhail that minimized the danger from drug toxicity; the medical treatment, however, had never been administered to a large group of children. *Id.* at 29. At the time of Dr. Robertson's deposition on June 11, 2004, the treatment had successfully prevented the tumor from redeveloping. Yet, the evidence shows that Mikhail suffers from residual effects of the treatment. Dr. Robertson testified:

> he has residual deficits. Gait affects, he has footdrop, he has abnormal positioning of his feet, he's wearing braces to kind of keep his feet in line so motorically he's been affected by that significantly. I also believe that he had what turned out to be synergistic effects that that neurologic deficit at the time he was most severe, certainly, caused psychologically and behaviorally and he started having a lot of behavioral problems around the time he developed his peripheral neuropathy.... Radiation therapy that he received we know has potential to cause neurocognitive, neurocognitive and probably behavioral deficits.... And he has some

vision problems ... [and] the toxicity of the vincristine [is] contributory to his overall neurodevelopmental problems currently.

*Id.* at 43–44. The doctor estimates that there is a fifty to seventy percent chance that the medulloblastoma will not reoccur and states that likelihood of relapse decreases as time passes. Mikhail likely will not receive further radiation or chemotherapy unless the tumor reoccurs. *Id.* at 27–28, 30.

The Dressers contend that as a result of the need to care for Mikhail's medical conditions, they incurred the loss of wages, extensive medical bills, transportation costs, severe mental anguish due to Mikhail's sickness, the loss of their home due to medical expenses, and the loss of job stature because of their inability to continue performing their normal course of employment due to the extended loss of time for Mikhail's medical treatments out of the area, emotional pain and suffering from the lack of time not available for their other children, and even physical distress resulting from the stressful circumstances. Am. Compl. ¶ 42. They filed their complaint in state court on February 18, 2003 alleging fraud, negligence, negligent infliction of emotional distress, and breach of contract. The defendants removed the case to this Court on April 3, 2003 on the basis of diversity jurisdiction. The plaintiffs filed an amended complaint on May 19, 2003 alleging the same four claims. The defendants filed their summary judgment motions in due course after the close of discovery.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable

inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). When the moving party has the burden of proof on an issue, whether it be a claim or affirmative defense, its "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (citation omitted). That said, there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The party who bears the burden of proof on an issue must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

 Since diversity jurisdiction is the source of this Court's authority to adjudicate the dispute, under the rule of *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), state law, as determined by the state's highest court, furnishes the substantive rules for decision. If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995) (quoting *Bailey v. V. & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data" includes the

state's intermediate appellate court decisions, *id.,* as well as the state supreme court's relevant *dicta,* "restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. American Broad. Corp.,* 820 F.2d 806, 807 (6th Cir.1987). This prescription includes the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts. . . . It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws."); *Mill's Pride, Inc. v. Cont'l Ins. Co.,* 300 F.3d 701, 704 (6th Cir.2002). Michigan's choice of law rules, therefore, must be used to resolve this dispute. Although the parties have not challenged the point, the Court determines that the law of Michigan furnishes the rules for decision in this case. *See Brandt v. Starwood Hotels and Resorts, Inc.,* 2004 WL 2958661 at *4 (E.D.Mich.Dec.14, 2004).

### A.

The plaintiffs allege that Cradle of Hope committed fraud by misrepresenting Mikhail's medical condition during the adoption process and by withholding material information about his health. The Dressers allege that they wanted a healthy child, Cradle of Hope represented that the child was healthy, and the child was not actually healthy. The plaintiffs argue that Cradle of Hope and its agents did not fully disclose Mikhail's medical history. They contend that Mikhail's three-page health summary given to them prior to adoption is vastly different from the medical records they received after Mikhail was diagnosed with the medulloblastoma.

### 1.

■ As part of its argument that there is no evidence in the record of fraud, Cra-

dle of Hope contends that the Russian adoption coordinator, Tatyana Kostko, was not its agent and Cradle of Hope is not accountable for her misstatements or failure to disclose information, if any. Cradle of Hope asserts that Kostko was not actually its employee and the plaintiffs have offered no evidence establishing that she was so employed. However, under Michigan law, an agency by estoppel can be found "where it is shown that the principal held the agent out as being authorized, and a third person, relying thereon, acted in good faith upon such representation." *Howard v. Park,* 37 Mich.App. 496, 499, 195 N.W.2d 39, 40 (1972); *see Grewe v. Mt. Clemens General Hospital,* 404 Mich. 240, 250–251, 273 N.W.2d 429, 433 (1978) (holding that "if the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be afforded by physicians working therein, an agency by estoppel can be found").

Cradle of Hope's adoption package contains instructions to prospective adoptive parents to "rely on the people [in Russia] who work for us." Pls. Opp. to Dfs. Mots. Summ. J. Ex. 7, Adoption Information Package, at 7. The package explains that "families adopting children outside Moscow will have a coordinator in Moscow during their way in, then a different coordinator in their child's hometown." *Ibid.* Rather than disavowing any relationship between the coordinator and Cradle of Hope, the defendant's literature exhorted, "Your coordinator is your closest ally, the person who works the hardest and cares the most that you go home soon and happy. Your coordinators will be highly educated professionals unable to support their families on the salary they would earn in their profession in a struggling Russia. Trust this person! Don't question their motives or mode of operation." *Ibid.*

In light of these instructions, Marilyn Dresser understandably testified:

Q.... Do you have any recollection of anybody from Cradle of Hope telling you that Tatyana was employed by MG Services? I'm sorry, All Ways. I stand corrected.

A. I was told a number of times by people who worked for Cradle of Hope that their coordinator in Russia was Tatyana.

Q. In terms of who she was actually employed by though, you didn't have any discussions with anybody from Cradle of Hope?

A. No, it was implied.

Q. Did you assume that to be the case?

A. I assumed that she was employed by Cradle of Hope, yes.

Cradle of Hope Mot. Summ. J. Ex. 3, Marilyn Dresser Dep. at vol. II, 7–8. Likewise, Richard Dresser testified:

Q. You never made a request of Tatyana to compare the three-page summary that you received from Cradle of Hope with the medical records that she was reviewing in the orphanage, did you?

A. No, I trusted Tatyana, and I trusted Cradle of Hope.

Cradle of Hope Mot. Summ J. Ex. 7, Richard Dresser Dep. at vol. I, 74.

■ The Court must view this evidence in the light most favorable to the plaintiffs. The Court believes that the testimony and documentation described above create an ample basis for finding a question of fact on the issue of whether Kostko was Cradle of Hope's agent. For the purpose of the analysis that follows, therefore, the Court will assume that she was.

### 2.

■ In order to establish a claim for intentional fraud, Michigan law requires plaintiffs to plead and prove the following elements:

(1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813, 815–16 (1976); *see also Hord v. Envtl. Research Inst. of Michigan,* 228 Mich.App. 638, 642, 579 N.W.2d 133, 135 (1998), *rev'd on other grounds after remand,* 463 Mich. 399, 617 N.W.2d 543 (2000). Failure to prove any one of these elements is fatal to the plaintiff's claim. *Ibid.* "[F]raud may be established by circumstantial evidence." *Foodland Distribs. v. Al–Naimi,* 220 Mich.App. 453, 457–458, 559 N.W.2d 379 (1996). However, "Michigan Courts have recognized that silence cannot constitute actionable fraud unless it occurred under circumstances where there was a legal duty of disclosure." *M&D, Inc. v. McConkey,* 231 Mich.App. 22, 26–27, 585 N.W.2d 33 (1998). The plaintiff must act reasonably when relying on a misrepresentation and "[t]here can be no fraud where a person has the means to determine that a representation is not true." *Nieves v. Bell Indus., Inc.,* 204 Mich.App. 459, 464, 517 N.W.2d 235, 238 (1994).

■ Michigan courts, and federal courts interpreting Michigan law, have expounded the last two elements on the issue of causation. They have concluded that the false representation relied on by the plaintiff actually must be the proximate cause for the alleged injury. *See Christensen v.*

*Michigan State Youth Soccer Ass'n, Inc.*, 218 Mich.App. 37, 44–45, 553 N.W.2d 638, 641–642 (1996); *see also Jackson v. St. Paul–Mercury Indem. Co.*, 339 F.2d 40, 45 (6th Cir.1964) (holding that despite alleged fraud there was evidence that the plaintiff would have acted in the same manner, thereby constituting the actual cause of his damages); *Blakely v. First Federal Savings Bank & Trust*, 93 F.Supp.2d 799, 805 (E.D.Mich.2000) (finding no proximate cause against certain defendants based on fraud where another agency was the cause of the plaintiff's damages).

The plaintiffs contend that Cradle of Hope's agents knowingly made misrepresentations that Mikhail was healthy boy, which induced the plaintiffs to commit to the adoption. The alleged misrepresentations of Mikhail's health relate to his diagnosis of perinatal encephalopathy, his Apgar scores, and exaggeration of Mikhail's abilities and recoveries from medical complications. The Dressers further contend that Cradle of Hope and Kostko misrepresented and omitted information about Mikhail's past medical history intending to induce them to adopt Mikhail and that even if Kostko had sufficiently disclosed Mikhail's health history, the disclosure occurred too late for them to decline the adoption. As a consequence, they claim, the plaintiffs proceeded to adopt a sickly youngster who eventually suffered medical complications that have cost the Dressers dearly in costs for medical and related care.

■ The problem with this argument, the Court believes, is that there is no evidence that the primary cause of Mikhail's medical difficulties can be traced to the conditions in the years before the Dressers adopted him. Although Mikhail may have had problems from birth that caused slow development and required extensive and intensive care, he seems to have progressed to the point that, when

the Dressers brought him to Michigan, he was declared a "healthy child" by Dr. Van-Geldern, his family pediatrician. His subsequent course has proved to be quite grave, but the Dressers have not demonstrated that Cradle of Hope, its agents, or anyone knew, or even could have known, of the medulloblastoma or that any of Mikhail's prior conditions contributed to its onset. Dr. Robertson, the pediatric neurologist, was questioned extensively on this point and testified as follows:

Q. Based upon what you've been able to gather by way of the history provided by the parents and the medical records, Doctor, there was no clinical indication of the onset of medulloblastoma until August of 2000, would that be a fair statement?

A. Right, from the initial history, that's correct.

Q. And that's because at least up until a month before the diagnosis was provided, there was no indication of persistent vomiting, correct?

A. At the time that was the history as it was related.

Q. He had a history of persistent vomiting for about a month?

A. Yes.

Q. And a history of headaches for about a month?

A. Yes.

Q. A history of unsteady gait for about a month?

A. Correct.

Q. Those are all factors which you would look for in terms of the onset of a brain tumor?

A. Persistent symptoms and progressive symptoms, persistent and progressive symptoms like that, headache, vomiting, are typically the symptoms that occur before a diagnosis of medulloblastoma is made. There may or may not

be preceding history of less persistent and nonprogressive symptoms like intermittent headache, intermittent vomiting, other things that can go on for longer and slowly, more slowly progressive changes in gait or problems that often precede that, but the shorter history of progressive persistent symptoms is usually what precedes the diagnosis.

Q. So at least up until a month before the diagnosis was made, there would not have been any reason to order an MRI study to look for the potential of a brain tumor developing?

A. Probably not.

Q. And you would agree with me within a reasonable degree of medical certainty that the diagnosability, for lack of a better description of the tumor, wouldn't have been able to have been made until August of 2000?

A. Likely.

Q. Certainly you would not have expected that a diagnosis of a medulloblastoma could have been made back in February of 2000?

A. I think it's unlikely.

Q. Why is that, Doctor?

A. Because the symptoms caused by medulloblastoma usually, though they may occur and start to be progressive over a number of months, usually not longer than several months, it's unusual to have symptoms—

. . . . .

Q. You wouldn't have expected the diagnosis to have been made in February of 2000, in all likelihood based upon the clinical presentation of Mikhail that diagnosis could not have been made until August of 2000?

A. No, it could have been made, but it wouldn't have likely have been made.

Cradle of Hope Mot. Summ. J. Ex. 15, Patricia Robertson Dep. at 14–17. Dr. VanGelderen testified that Mikhail did not show symptoms sufficient to warrant an MRI study until the beginning of September 2000 and that the September 7, 2000 brain scan provided the first indication that Mikhail had a tumor. Cradle of Hope Mot. Summ. J. Ex. 23, Jeffery VanGelderen Dep. at 21–23, 26–27, 29–30.

Moreover, the Dressers had an indication of Mikhail's problems before the adoption was finalized. They contend that Cradle of Hope represented to them before they agreed to go to Russia to see the boy that Mikhail was a healthy child; the Court agrees that in light of the medical history contained in the summary and later in the larger file, this assertion is certainly subject to question. However, much of this information was disclosed to the Dressers before the Russian court hearing, as confirmed by Richard Dresser's notes that he took during a briefing by Tatyana Kostko. The plaintiffs contend that they had committed to adopting Mikhail before this information was disclosed, and even if they detected a medical problem that otherwise might have dissuaded them from proceeding, the information came too late. That claim does not survive due to the plain language of the Adoption Process Statement that they signed, which sets forth a schedule of charges for withdrawing from the process at virtually every step along the way until the adoption is final. The information disclosed to the Dressers in Russia, which is not materially different than that which finally emerged in the complete medical file, provided fair warning that Mikhail had not been healthy, and that the Dressers would proceed with the process at their peril.

The undisputed evidence in the record establishes that regardless of any representations made by Cradle of Hope in America or by their actual or putative representatives in Russia, the Dressers knew or should have known before they finalized the adoption that Mikhail had

spinal trauma, slow development and speech difficulties, and birth defects. There also in no genuine dispute that the earlier ailments did not cause or contribute to the brain tumor. Consequently, the Court concludes that the plaintiffs have not come forward with sufficient evidence establishing a material fact question on whether the plaintiffs acted in reliance upon any false representation, and whether their detrimental reliance was the cause of the damages they claim. Summary judgment, therefore, will be granted on the claim of intentional fraud.

### B.

The plaintiffs also contend that the defendants failed to provide timely information to them that would have impacted the choice of therapy selected by Dr. Robinson in treating the medulloblastoma. They also assert that the defendants breached their duty to the Dressers and to Mikhail to provide timely and accurate information pertaining to Mikhail's medical condition. Finally, the plaintiffs claim that the defendants' conduct caused the infliction of emotional distress upon the Dressers. These claims all sound in simple negligence.

In Michigan, recovery may be premised upon a misrepresentation negligently or innocently made. *See U.S. Fidelity and Guaranty Co. v. Black,* 412 Mich. 99, 120–21, 313 N.W.2d 77, 86 (1981) (holding that "independent proof of intent to induce reliance is unnecessary to maintain an action in deceit under the doctrine of innocent misrepresentation inasmuch as a material statement made in the course of contractual negotiations is presumptively made with the intention that it should be relied upon"). However, the authorities are not uniform as to whether an adoption agency has a duty to investigate extensively and report on a child's medical history. *See* Harriet Dinegar Milks, Annot., *"Wrongful adoption" causes of action against adoption agencies where children*

*have or develop mental or physical problems that are misrepresented or not disclosed to adoptive parents,* 74 A.L.R.5th 1 (1999).

No Michigan case speaks directly to the issue, but this Court need not resolve the question today concerning the Dressers' own claims because they have waived their negligence claims by the express language contained in the adoption agreement they signed. The adoption agreement plainly outlines the health risks of adopting a foreign child, warns that medical information may be unreliable or incomplete, and disclaims any guarantee that the child located by the agency will be healthy. The agreement then contains the explicit waiver language set forth above, which is repeated here:

> *Waiver of Claims:* Clients hereby waive any and all claims they may have now or in the future against CHAC and its directors, officers, employees and agents, including doctors. Clients agree to hold CHAC and its directors, officers, employees and agents, including doctors, harmless against any claims known or unknown now existing or in the future, which may arise out of this agreement, receipt of services from, or adoption through CHAC.

Cradle of Hope Mot. Summ. J. Ex. 6, Adoption Agreement at ¶ 20.

Michigan courts have held that "a party may not insulate himself against liability for gross negligence or wilful and wanton misconduct." *Lamp v. Reynolds,* 249 Mich.App. 591, 594, 645 N.W.2d 311 (2002). Consequently, the waiver language would not bar a claim for intentional fraud. However, the state courts have held that waiver provisions are an enforceable bar to negligence claims when the putative plaintiff "fairly and knowingly" enters into an agreement with legal capacity and under no fraud or duress. *Paterek*

*v. 6600 Ltd.*, 186 Mich.App. 445, 465 N.W.2d 342 (1990), *modified on other grounds by Patterson v. Kleiman*, 447 Mich. 429, 433–435, 526 N.W.2d 879, 881 (1994). A Michigan court will invalidate such a release only if "(1) the releasor was dazed, in shock, or under the influence of drugs, (2) the nature of the instrument was misrepresented, or (3) there was other fraudulent or overreaching conduct." *Ibid.* Overbroad waiver provisions that disclaim all liability are construed to disclaim only simple negligence. *See Universal Gym Equip., Inc. v. Vic Tanney Int'l, Inc.*, 207 Mich.App. 364, 367, 526 N.W.2d 5 (1994), *vacated in part on other grounds*, 209 Mich.App. 511, 531 N.W.2d 719 (1994); *see also Klann v. Hess Cartage Co.*, 50 Mich.App. 703, 709, 214 N.W.2d 63 (1973) (holding that "[a]n indemnity provision which would be invalid if applied to indemnify a person from liability for his wilful and wanton wrongdoing may, nevertheless, be validly applied to indemnify him from liability for his negligent acts").

In this case, the plaintiffs do not attempt to disavow knowledge of the release or claim confusion over its terms. They insist, however, that the Court should not enforce it because it is overreaching and constitutes a contract of adhesion.

"Contracts of adhesion are characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under the circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement." *Morris v. Metriyakool*, 418 Mich. 423, 440, 344 N.W.2d 736, 742 (1984). In order for a court applying Michigan law to invalidate an agreement as a contract of adhesion, the party urging invalidation must show both that, based on the unequal bargaining power of the parties, their relative economic strength, and the lack of meaningful alternatives, the contracting party has no other options to obtain the goods or services; and the challenged term is substantively reasonable. *See Rehmann, Robson & Co. v. McMahan*, 187 Mich.App. 36, 43, 466 N.W.2d 325 (1991). "Where goods and services can only be obtained from one source (or several sources on non-competitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without." *Allen v. Michigan Bell Telephone Co.*, 18 Mich.App. 632, 637, 171 N.W.2d 689 (1969). However, "[m]erely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced." *Ibid.* In *Anderson's Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (6th Cir.1998), the Sixth Circuit distinguished *Allen* and found that the defendant did not have disparate bargaining power over the plaintiff. The court considered two factors when considering whether the contract was oppressive: "(1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable." *Id.* at 324.

The plaintiffs address the obvious argument that there are other adoption agencies that assist in the placement of European children by contending that Cradle of Hope was the only agency they could use to adopt Mikhail himself. That contention is not persuasive, however, in light of the fact that the Dressers knew nothing of the boy except what they were told by the defendant. Their interest was stimulated by a photograph in a newsletter, but it was Cradle of Hope that furnished the important details. Moreover, the plaintiffs acknowledge that they read and understood

the adoption agreement, signed it without duress or coercion, and never attempted to negotiate to change any of the terms. See Cradle of Hope Mot. Summ. J. Ex 2, Marilyn Dresser Dep. at vol. I, 155–56; Cradle of Hope Mot. Summ. J. Ex. 7, Richard Dresser Dep. at vol. I, 109. Finally, as noted earlier, Michigan courts have not found waiver or release provisions unreasonable as applied to claims of ordinary negligence. Likewise, other courts have held that similar provisions are consistent with public policy since the public has an interest in the viability of adoption agencies as well as an interest in protecting adoptive parents, and they have upheld similar provisions waiving the liability of adoption agencies. See Ferenc v. World Child, Inc., 977 F.Supp. 56, 60 (D.D.C. 1997) (upholding an adoption contract provision that waived "any and all claims").

The waiver language in the adoption agreement is valid and enforceable. The defendants, therefore, are entitled to judgment as a matter of law on the claims brought by the Dressers on their own behalf based on negligence.

## C.

■ This same analysis does not apply, however, with respect to the claim brought on behalf of Mikhail individually because he was not a party to the agreement between the Dressers and Cradle of Hope, and therefore he is not bound by the waiver language. The gravamen of the negligence claim brought on his behalf is that Cradle of Hope did not furnish his medical records to his new parents within a reasonable time and that failure had an adverse effect on the medical treatment subsequently provided following cancer surgery. To recover on that claim, the plaintiff must establish that Cradle of Hope breached a duty to furnish the records, and that the breach caused damages. See Valcaniant v. Detroit Edison Co., 470 Mich. 82, 89, 679 N.W.2d 689, 692 (2004)

(holding that a negligence claim has "four elements to [the] tort: duty, breach, causation, and damages").

■ The evidence in this case provides some heft to the plaintiff's causation theory: Dr. Robertson testified that had she known in advance that Mikhail had suffered spinal trauma at birth, a prior diagnosis of perinatal encephalopathy, slow development and speech difficulties, and birth defects, she would have determined that Mikhail had neurological pathology and was not a good candidate for vincristine treatment. Dr. Robertson said that she would have considered Mikhail's "cervical spine trauma, the perinatal encephalopathy with delayed development and neurologic problems and a history of possible seizures" when selecting Mikhail's chemotherapy treatment. Def. Mot. Summ. J. Ex 15, Patricia Robertson Dep. at 21–23. The critical issue, however, is whether the law recognizes a duty of an adoption agency to the adoptee to provide the child's medical records to the adopting parents within a reasonable time. Under Michigan law, the existence of a general duty is a question to be decided by the court. Simko v. Blake, 448 Mich. 648, 655, 532 N.W.2d 842, 846 (1995).

The Court is not aware of any Michigan case that addresses the issue of whether a duty exists between such parties. As mentioned earlier, therefore, this Court's task is to determine, based on "all relevant data," whether Michigan would recognize a duty to furnish a child's medical records arising from the relationship between an adoptee and an adoption agency such as Cradle of Hope. See Moning v. Alfono, 400 Mich. 425, 438–39, 254 N.W.2d 759, 765 (1977) (explaining that "[d]uty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured

person"). That determination will involve to some extent consideration of public policy because of the need to balance the utility of the actor's conduct and the magnitude of the risk involved. As the Michigan Supreme Court explained in *Moning*:

> The balancing of the magnitude of the risk and the utility of the actor's conduct requires a consideration by the court and jury of the societal interests involved. The issue of negligence may be removed from jury consideration if the court concludes that overriding considerations of public policy require that a particular view be adopted and applied in all cases.

*Id.* at 450, 254 N.W.2d at 770 (footnote omitted). The factors that courts consider in striking that balance include "the foreseeability of the harm, the degree of certainty of injury, the closeness of connection between the conduct and injury, the moral blame attached to the conduct, the policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach." *Babula v. Robertson*, 212 Mich.App. 45, 49, 536 N.W.2d 834, 837 (1995) (citing *Buczkowski v. McKay*, 441 Mich. 96, 101, n. 4, 490 N.W.2d 330 (1992)).

Other states have followed these same common law principles and found that traditional tort remedies apply in the adoption context. Ohio was the first state to recognize a common law fraud claim brought by adopting parents. *See Burr v. Board of County Comm'rs*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). In that case, adoption agency personnel made blatant misrepresentations about a child's current health and medical history upon which the parents relied in deciding to adopt him. The child turned out to be quite ill and suffered from a variety of physical and mental ailments. The parents eventually obtained the child's records, discovered that they had been deceived, and were allowed to bring a fraud claim against the agency. Three years later, Wisconsin held that an adoption agency could be found liable for negligence by misinforming prospective parents about the risk of an adopted child contracting Huntington's Disease. *Meracle v. Children's Serv. Soc'y*, 149 Wis.2d 19, 437 N.W.2d 532 (1989). Since then, a majority of jurisdictions that have considered the question have extended traditional fraud and negligence theories to provide relief to parents who sought to bring claims against adoption agencies for failure to disclose accurate histories of their adopted children. *See, e.g., Wolford v. Children's Home Soc'y of West Virginia*, 17 F.Supp.2d 577 (S.D.W.Va.1998) (holding that state would recognize claims for fraud and negligence in adoption setting); *Michael J. v. County of Los Angeles*, 201 Cal.App.3d 859, 247 Cal.Rptr. 504 (1988) (allowing parents' claim against adoption agency for intentional misrepresentation and fraudulent concealment); *Roe v. Catholic Charities*, 225 Ill.App.3d 519, 167 Ill.Dec. 713, 588 N.E.2d 354 (1992) (holding fraud can vitiate adoption order, and approving negligent claim based on breach of duty to disclose child's medical information in agency's possession); *Mohr v. Commonwealth*, 421 Mass. 147, 653 N.E.2d 1104 (1995) (holding agency has duty to disclose to adoptive parents child's historical information that will enable them to make informed adoption decision); *M.H. and J.L.H. v. Caritas Family Servs.*, 488 N.W.2d 282 (Minn.1992) (holding that adoption agency has duty to make full disclosure based on adoptive parents' need to secure timely and appropriate medical care and make critical family decisions); *Jackson v. State*, 287 Mont. 473, 956 P.2d 35 (1998) (recognizing adoptive parents' claim against adoption agency for negligent nondisclosure and holding full disclosure necessary to allow parents to obtain timely medical care for the child and en-

able parents to decide whether to adopt); *Juman v. Louise Wise Servs.,* 174 Misc.2d 49, 663 N.Y.S.2d 483 (N.Y.Sup.Ct.1997) (recognizing adoptive parents' fraud claim against adoption agency); *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882 (1994) (holding adoption agency has duty to disclose fully and accurately all nonidentifying information in its possession concerning adoptee); *Mallette v. Children's Friend and Serv.,* 661 A.2d 67 (R.I.1995) (holding that when agency undertakes to furnish family and medical history of adoptee it has duty to do so accurately, the breach of which constitutes negligent misrepresentation); *McKinney v. State,* 134 Wash.2d 388, 950 P.2d 461 (1998) (recognizing adoptive parents' claim against adoption agency for negligent failure to disclose statutorily mandated information); *see generally* Annot., 74 A.L.R.5th 1 (1999 & Supp.2004). The few cases in which claims were rejected did not find the adoption agency immune or that no duty existed; rather, the claims failed for want of proof of one or more of the elements of a traditional tort. *See Engstrom v. State,* 461 N.W.2d 309 (Iowa 1990) (agency not negligent in failing to discover that birth father was still alive and would oppose the adoption); *MacMath v. Maine Adoption Placement Servs.,* 635 A.2d 359 (Me.1993) (no negligence by agency in absence of evidence that agency withheld and adoptive parents never requested information); *Foster v. Bass,* 575 So.2d 967 (Miss.1990) (no negligence where agency did not confirm that child was positive for phenylketonuria, a test for mental retardation, where agency had no duty to perform test and reasonable could not have foreseen that doctors would fail to test child).

The nature of the relief sought in those cases has ranged from voiding the adoption order to money damages for extraordinary expenses incurred in meeting the special needs of the child. In a few cases, damages were sought because the failure to provide an accurate medical history caused a delayed or erroneous diagnosis or improper medical treatment. In all the cases, however, the damages were awarded to the parents.

The Court has found no case in which an adopted child has recovered damages for the adoption agency's failure to convey accurate medical information to the new parents. Of course, such a claim could not be based on fraud because no misstatement could be made to the adoptee and there would be no reliance by the child. In the three cases that the court found in which a negligence theory was advanced, two were dismissed because there were no damages to the child flowing from the agency's failure to turn over medical records in its possession, *see Siler v. Lutheran Soc. Servcs. of Metro., N.Y.,* 10 A.D.3d 646, 782 N.Y.S.2d 93 (Sup.Ct.2004) (dismissing negligence action by adopted twins alleging failure to disclose results of HIV testing because "[d]amages are a necessary element of a negligence claim" and "the defendant conclusively demonstrated that the twins sustained no damages proximately caused by the defendant's alleged failure to apprize their parents of the twins' HIV status"), *Roe,* 588 N.E.2d at 358–59 (holding that children's claim for fraudulent misrepresentation failed when they alleged that absent fraud the agency, not the parents, would have dealt with their health problems since children did not allege "identifiable injury in either fraud or negligence"); and in the other a federal court declined to consider a novel state law theory. *Dahlin v. Evangelical Child & Family Agency,* 2001 WL 840347 (N.D.Ill.2001).

▆ Nonetheless, the Court believes recognition of a duty of an adoption agency to the adopted child to furnish to the new parents the medical records available to it is both a logical and incremental extension

of well-recognized and firmly-rooted tort principles, and consistent with established state policy. The Michigan legislature plainly has ordained a policy of full disclosure by adoption agencies of the medical history of prospective adoptees. The pertinent statute states:

> (1) Before placement of a child for adoption, a parent or guardian, a child placing agency, the department, or the court that places the child shall compile and provide to the prospective adoptive parent a written document containing all of the following nonidentifying information that is not made confidential by state or federal law and that is reasonably obtainable from the parents, relatives, or guardian of the child; from any person who has had physical custody of the child for 30 days or more; or from any person who has provided health, psychological, educational, or other services to the child:
>
> (a) Date, time, and place of birth of the child including the hospital, city, county, and state.
>
> (b) An account of the health and genetic history of the child, including an account of the child's prenatal care; medical condition at birth; any drug or medication taken by the child's mother during pregnancy; any subsequent medical, psychological, psychiatric, or dental examination and diagnosis; any psychological evaluation done when the child was under the jurisdiction of the court; any neglect or physical, sexual, or emotional abuse suffered by the child; and a record of any immunizations and health care the child received while in foster or other care.

Mich. Comp. Laws § 710.27. Although Cradle of Hope may not fall precisely within the definition of a state child placement agency, see Mich. Comp. Laws §§ 710.22(j), § 722.111(c), and therefore may not be bound by the statute, the legislature nonetheless has made clear its preference for disclosure, and the Court believes that Michigan courts would recognize that an adoption agency like Cradle of Hope has a legal duty to furnish the adopted child's medical information within its control or reasonably available to it to the new parents.

The question whether that duty would extend to protect the child calls for an evaluation of foreseeability. In this regard, "[t]he questions of duty and proximate cause are interrelated because the question whether there is the requisite relationship, giving rise to a duty, and the question whether the cause is so significant and important to be regarded a proximate cause both depend in part on foreseeability whether it is foreseeable that the actor's conduct may create a risk of harm to the victim, and whether the result of that conduct and intervening causes were foreseeable." *Moning,* 400 Mich. at 439, 254 N.W.2d at 765. However, "it is not necessary that the manner in which a person might suffer injury be foreseen or anticipated in specific detail." *Babula,* 212 Mich.App. at 53, 536 N.W.2d at 839 (citing *Clumfoot v. St. Clair Tunnel Co.,* 221 Mich. 113, 117, 190 N.W. 759, 760 (1922)). The question is whether one reasonably might anticipate that the failure to furnish historical medical information of a child who has had an eventful and stormy medical course from birth could jeopardize future medical care. To answer that question the Court need only turn to other jurisdictions that have endorsed a duty of full disclosure. The Pennsylvania Supreme Court's observation is representative:

> Adoption experts are virtually unanimous in the belief that complete and accurate medical and social information should be communicated to adopting parents. Providing full and complete information is crucial because the consequences of non-disclosure can be cata-

strophic; ignorance of medical or psychological history can prevent the adopting parents and their doctors from providing effective treatment, or any treatment at all.

*Gibbs*, 647 A.2d at 886–87 (footnotes omitted).

Requiring full disclosure creates no undue burden on the adoption agency. The duty recognized today does not create an obligation upon the agency to conduct a comprehensive investigation of a child's physical and mental health. *See Nierengarten v. Lutheran Soc. Servs. of Wisconsin*, 209 Wis.2d 538, 563 N.W.2d 181, 188 (1997), *rev'd on statute of limitations grounds*, 219 Wis.2d 686, 580 N.W.2d 320 (1998). Nor will such an obligation unduly inhibit the agency's ability to place children or reduce the number of successful adoptions. *See Gibbs*, 647 A.2d at 887 (rejecting such concerns).

The Court finds that Michigan courts, consistent with the State legislature's expressed policy of full disclosure of a child's medical information to prospective adopting parents, would apply traditional tort law concepts to recognize a duty of an adoption agency to an adopted child to furnish the new parents with medical and family records in its possession or reasonably available to it within a reasonable time. Having determined that such a duty exists in this case, the Court finds that the plaintiffs have come forward with evidence to establish a material fact issue on the negligence claim advanced on behalf of Mikhail. Summary judgment on that count, therefore, will be denied.

### D.

The plaintiffs also argue that Cradle of Hope breached that part of the adoption contract obliging it to furnish background information on the child. The contract states that "Cradle of Hope will furnish Clients all medical and social information available to it pertaining to any child offered to Clients, but cannot guarantee that any child is or will be healthy or that the medical information provided will be accurate or complete. Clients understand that their child could arrive with undiagnosed physical, mental, emotional, and/or developmental problems." Cradle of Hope Mot. Summ. J. Ex. 6, Adoption Agreement at ¶ 4.

■ The plaintiffs' claim here fails because there is no direct evidence that Cradle of Hope had possession of Mikhail's medical history before the Dressers went to Russia, nor is there evidence that any of its agents had the records before Tatyana Kostko went over them with the Dressers in Birobidjan. Although the Dressers testified that it appeared to them that Kostko had access to the files at the orphanage, there is no evidence that she actually learned about Mikhail's medical problems before she met with the Dressers at the orphanage itself. Moreover, the undisputed medical evidence has established that the defendants could not have known that Mikhail would suffer from medulloblastoma prior to August 2000. It is undisputed that the damages claimed by the plaintiffs flowing from the contract breach resulted from developments that occurred much later.

### E.

■ The Dressers fail to demonstrate that an agent of All Ways made fraudulent representations to them concerning the adoption. Aleksander Smukler, president of All Ways, swore that:

All Ways had no involvement in the adoption process, the procurement or review of medical information, discussions concerning the health of their prospective adopted child, or the hearings held by the Russian court in connection with their adoption.

All Ways Mot. Summ. J. Ex. B, Aleksander Smukler Aff. ¶ 10. However, he also swore that All Ways provided interpreters for the Dressers' discussions at the orphanage. *Ibid.* The Dressers allege that at least one interpreter at the orphanage used her personal knowledge to tell them about Mikhail's medical condition. Cradle of Hope Mot. Summ. J. Ex 3, Marilyn Dresser Dep. at vol. II, 170–173. Even if the interpreters made representations about Mikhail's condition from their own knowledge, the Dressers failed to identify evidence demonstrating that the interpreters knew their statements were misleading or made with recklessness, or had intent to deceive the Dressers into adopting Mikhail. The Dressers did not depose any of the interpreters.

 Nor do the Dressers present any basis for finding that All Ways had a duty to provide Mikhail's medical information. As noted above, "[t]he existence of duty is a question of law for the court." *Simko,* 448 Mich. at 655, 532 N.W.2d at 846. Courts consider the following factors when deciding whether to recognize a particular duty: "[t]he relationship between the parties, the nature and foreseeability of the risk to be avoided, and the burdens and benefits of recognition." *Valcaniant,* 470 Mich. at 89, 679 N.W.2d at 692. In this case, the evidence establishes that the interpreters were only hired to translate oral discussions for the Dressers in Russia. The relationship requires an interpreter to correctly translate one language to another, but not to verify the reliability of the information she translates.

Finally, All Ways and the Dressers did not enter into a contract with each other. Therefore, there is no basis upon which to predicate a breach of contract claim.

### III.

The Court concludes that the plaintiffs have not come forth with evidence that creates a genuine fact question on each element of its intentional fraud claim against defendant Cradle of Hope. The plaintiffs' negligence claims are barred by the waiver executed by the plaintiffs. There is no evidence of a breach of contract that resulted in the damages claimed by the plaintiffs. The plaintiffs likewise have failed to bring forth evidence to sustain their claims against defendant All Ways International, Inc.

Accordingly, it is **ORDERED** that the defendants' motions for summary judgment [dkt # 59, 60] are **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE AS TO ALL CLAIMS** against defendant All Ways International, Inc., and all claims brought against defendant Cradle of Hope by plaintiffs Richard Dresser and Marilyn Dresser on their own behalf. Cradle of Hope's motion for summary judgment of dismissal of the negligence claim brought on behalf of Mikhail Robert Dresser, a minor, is **DENIED.**

It is further **ORDERED** that the plaintiffs' motion to extend discovery [dkt # 73], motion to compel [dkt # 71], motion for reconsideration of order denying additional extension to file reply [dkt # 83], motions *in limine* [dkt # 81, 82], the defendants' motion for a protective order [dkt # 87] and the defendants' motions *in limine* [dkt # 87, 89, 95] are **DENIED as moot.**